# UNITED STATES DISTRICT COURT

# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Rebecca Scifo, Brian Nulf, Pamela Smith, Sierra Allen, Thomas Cronin, Tennerson Collins, and Otilia Collins, individually and on behalf of all others similarly situated,<br><br>             Plaintiffs,<br><br>      v.<br><br>Alvaria, Inc. & Carrington Mortgage Services, LLC,<br><br>             Defendants. | CASE NO.: 1:23-cv-10999-ADB |

## CONSOLIDATED CLASS ACTION COMPLAINT
## (With Jury Trial Demanded)

Plaintiffs Rebecca Scifo, Brian Nulf, Pamela Smith, Sierra Allen, Thomas Cronin, Tennerson Collins, and Otilia Collins ("Plaintiffs"), by their undersigned counsel, file this Consolidated Amended Class Action Complaint on behalf of themselves and a class of similarly situated persons against Alvaria, Inc. ("Alvaria") and Carrington Mortgage Services, LLC ("Carrington") (collectively "Defendants"). Plaintiffs base the forgoing allegations upon personal information and belief, the investigation of counsel, and state the following:

## INTRODUCTION

1.      Alvaria is a workforce management and call center technology solution company. It provides these services to Carrington, which is the current owner of Plaintiffs' home mortgages.

2.      On March 9, 2023, third party hackers breached Alvaria's data system, including a portion of Alvaria's customer environment that maintained customer's workforce management and/or outbound dialer data ("Data Breach"). Some of the data the hackers procured or exfiltrated in the Data Breach was associated with Carrington and included Plaintiffs' sensitive personally identifiably information ("PII"), including their names, mailing addresses, telephone numbers, loan numbers, current loan balance, and the last four digits of their Social Security numbers.

3.      This is the second data security incident at Alvaria in four months. Last November, the company suffered a hack by the Hive Ransomware group which impacted nearly 5,000 customers.[1]

4.      Neither Carrington nor Alvaria have disclosed the total number of customers and clients impacted by the Data Breach.  However, Alvaria did

---

[1] *Tech vendor names Carrington in data breach notice*, NEXT, May 3, 2023, https://nextmortgagenews.com/news/tech-vendor-names-carrington-in-data-breach-notice/ (last visited Aug. 14, 2023)

report to the Massachusetts Attorney General that at least 4,167 Massachusetts residents were impacted by the Data Breach.[2]  In addition, Carrington reported the Data Breach to the California Attorney General's Office and provided a sample of the data breach notice letter Defendants sent to 500 or more California residents, notifying them that their unencrypted personal information, or PII, was acquired, or reasonably believed to have been acquired, by an unauthorized person.

5.     Because the Data Breach compromised Plaintiffs' sensitive personal information, Plaintiffs and the Class (defined below) have been placed in an immediate and continuing risk of harm from fraud, identity theft, and related harm caused by the Data Breach.

6.     As a result of Defendants' conduct, Plaintiffs and the Class have and will be required to continue to undertake time-consuming and often costly efforts to mitigate the actual and potential harm caused by the Data Breach. This includes efforts to mitigate the breach's exposure of their PII, including by, among other things, placing freezes and setting alerts with credit reporting agencies, contacting financial institutions, closing, or modifying financial accounts, reviewing, and monitoring credit reports and accounts for

---

[2] Andrew Martinez, *Carrington Reports Ransomware Attack at Tech Vendor*, National Mortgage News, May 2, 2023,  (last visited Aug. 14, 2023)

unauthorized activity, changing passwords on potentially impacted websites and applications, and requesting and maintaining accurate records.

7.    Plaintiffs therefore bring this Class Action seeking relief and damages against Defendants for themselves  and all other persons who were similarly impacted by the Data Breach and Defendants' inadequate data security procedures and practices.

## JURISDICTION

8.    This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332, as amended by the Class Action Fairness Act of 2005. Subject matter jurisdiction is proper because: (1) the amount in controversy in this class action exceeds five million dollars ($5,000,000), excluding interest and costs; (2) there are more than 100 Class members; (3) at least one member of the Class is diverse from the Defendants; and (4) the Defendants are not a government entity.

9.    Alvaria is a Delaware corporation with its principal place of business in Westford, Massachusetts.

10.    Carrington is a limited liability company organized under the laws of Delaware with its principal place of business in Anaheim, California.

11.    This Court has personal jurisdiction over Defendants because Defendants' acts or omissions and false or misleading representations

regarding the security of Plaintiffs' and Class members' personally identifiable information  ("PII") alleged herein occurred in Massachusetts. Defendant Alvaria has a principal place of business in Massachusetts.   Defendant Carrington does regular business with Alvaria (a Massachusetts company), is registered to do business in Massachusetts, has a registered agent for service of process in Massachusetts, transacts business in Massachusetts, and contracts to supply services or things in Massachusetts, as provided in M.G.L., c. 233A, §§ 3(a) and (b).

12.     This Court is the proper venue for this case pursuant to 28 U.S.C. § 1391(a) and (b) because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District and because Defendants reside and/or are registered to do business and transact business in this District.

## PARTIES

13.     **Plaintiff** Rebecca Scifo is and has been for all relevant times a resident of Chancellor, South Dakota and is a citizen of South Dakota. Carrington currently owns Ms. Scifo's home mortgage and has owned her mortgage for approximately the last three years.  Ms. Scifo received a notice letter from Alvaria on May 2, 2023, indicating that her data, including her name, mailing address, telephone number, loan number, current loan balance, and the last four digits of her Social Security Number had been implicated in Alvaria's

March 9, 2023, data breach.  Since notice of the Data Breach, Ms. Scifo has spent time and effort monitoring her accounts for identity theft or fraud.

14.   **Plaintiff** Brian Nulf is and has been for all relevant times a resident and citizen of the State of Indiana.  Carrington owns and/or services Mr. Nulf's home mortgage. Mr. Nulf received a notice letter from Alvaria indicating that his data, including his name, mailing address, telephone number, loan number, current loan balance, and the last four digits of his Social Security Number had been implicated in Alvaria's March 9, 2023, data breach.  Since notice of the Data Breach, Mr. Nulf has spent time and effort monitoring his accounts for identity theft or fraud, including approximately 5 hours researching the Data Breach, verifying the legitimacy of the notice letter, reviewing his bank accounts, monitoring his credit report, filtering through the increased number in spam calls and emails that began soon after the Data Breach, and other necessary mitigation efforts.

15.   **Plaintiff** Pamela Smith is and has been for all relevant times a resident and citizen of the State of Illinois. Carrington owns and/or services Ms. Smith's home mortgage.  Ms. Smith received a notice letter from Alvaria indicating that her data, including her name, mailing address, telephone number, loan number, current loan balance, and the last four digits of her Social Security Number had been implicated in Alvaria's March 9, 2023, data breach.

Since notice of the Data Breach, Ms. Smith has spent time and effort monitoring her accounts for identity theft or fraud, including approximately 3 hours researching the Data Breach, verifying the legitimacy of the notice letter, signing up for the credit monitoring service, reviewing her bank accounts, monitoring her credit report, changing her passwords and payment account numbers, and other necessary mitigation efforts.  Ms. Smith has also received numerous suspicious spam calls and emails (a) requesting that she pay off a debt or she may be arrested; (b) notifying her of a cash advance that she did not seek; (c) approving her for loans she did not apply for; and (d) requesting her password for bank accounts. She also receives spam telephone calls regarding her Medicaid insurance. Ms. Smith recently experienced credit issues as well. For example, in or around March or April 2023, she was denied an increase on her Macy's credit card without explanation.

16.     **Plaintiff** Sierra Allen is and has been for all relevant times a resident and citizen of the State of Illinois. Carrington owns and/or services Ms. Allen's home mortgage.   Ms. Allen received a notice letter from Alvaria indicating that her data, including her name, mailing address, telephone number, loan number, current loan balance, and the last four digits of her Social Security Number had been implicated in Alvaria's March 9, 2023, data breach. Since notice of the Data Breach, Ms. Allen has spent time and effort monitoring

her accounts for identity theft or fraud, including approximately 6 hours researching the Data Breach, verifying the legitimacy of the notice letter, signing up for the credit monitoring service, reviewing her bank accounts, monitoring her credit report and other necessary mitigation efforts. Ms. Allen has also experienced an increase in mortgage and/or loan-related spam communications. She receives six or more spam telephone calls daily and attributes such to the fact that her telephone number and loan information were compromised in the Data Breach.

17.   **Plaintiff** Thomas Cronin is and has been for all relevant times a resident and citizen of the State of Pennsylvania.  Carrington owns and/or services Mr. Cronin's home mortgage.  Mr. Cronin received a notice letter from Alvaria indicating that his data, including his name, mailing address, telephone number, loan number, current loan balance, and the last four digits of his Social Security Number had been implicated in Alvaria's March 9, 2023, data breach. Since notice of the Data Breach, Mr. Cronin has spent time and effort monitoring his accounts for identity theft or fraud, including approximately 8-10 hours researching the Data Breach, verifying the legitimacy of the notice letter, signing up for the credit monitoring service, reviewing his bank accounts, monitoring his credit report, and other necessary mitigation efforts.  Mr. Cronin also recently experienced an unauthorized charge on his debit card. The

unauthorized charge occurred on or around May 8, 2023, in the amount of $69.10. Mr. Cronin spent time successfully disputing the unauthorized charge with his bank.

18.     **Plaintiff** Tennerson Collins is and has been for all relevant times a resident and citizen of the State of California. Carrington owns and/or services Mr. Collins' home mortgage. Mr. Collins received a data breach notice letter from Alvaria indicating that his personal information, including his name, mailing address, telephone number, loan number, current loan balance, and the last four digits of his Social Security Number had been contained in the files impacted by the Data Breach.  Since notice of the Data Breach, Mr. Collins has spent time and effort monitoring his accounts for identity theft or fraud, including approximately 10 hours researching the data breach, verifying the legitimacy of the notice letter, signing up for credit monitoring service, monitoring his credit reports and financial accounts, and other necessary mitigation efforts, including spending approximately 1.5 – 2 hours per day closely reviewing accounts for any unusual activity attributable to the Data Breach. Mr. Collins has experienced anxiety, stress, and lost sleep following notice of the Data Breach. Further, Mr. Collins has noticed a significant increase in the number of suspicious SPAM calls, text messages, and emails, including notifications regarding attempts to change his Facebook account password,

which he attributes to his personal information being compromised in the Data Breach.

19.  **Plaintiff** Otilia Collins is and has been for all relevant times a resident and citizen of the State of California. Carrington owns and/or services Mrs. Collins' home mortgage. Mrs. Collins received a data breach notice letter from Alvaria indicating that her personal information, including her name, mailing address, telephone number, loan number, current loan balance, and the last four digits of his Social Security Number had been contained in the files impacted by the Data Breach. Since notice of the Data Breach, Mrs. Collins has spent time and effort monitoring her accounts for identity theft or fraud, including approximately 10 hours researching the data breach, verifying the legitimacy of the notice letter, signing up for credit monitoring service, monitoring her credit reports and financial accounts, and other necessary mitigation efforts, including at least 20 minutes per day reviewing accounts for any unusual activity.  Mrs. Collins has experienced anxiety, stress, experienced new health issues, and lost sleep following notice of the Data Breach. Mrs. Collins received notifications regarding unusual and unauthorized attempts to use or access her Apple ID following the Data Breach, requiring her to spend time scheduling and traveling to an appointment at an Apple store for assistance with her phone. Further, Mrs. Collins has noticed a significant

increase in the number of suspicious emails, including notifications regarding attempts to change her Facebook account password, and notifications regarding attempts to use or change her cellular phone's Apple ID, which she attributes to his personal information being compromised in the Data Breach.

20.    **Defendant** Alvaria is a corporation with its headquarters and principal place of business at 5 Technology Park Drive, Westford, Massachusetts, 01886.

21.    **Defendant** Carrington is a limited liability company formed in Delaware with its principal and mailing address located in Anaheim, California. Massachusetts' registered agent is CT Corporation System located at 155 Federal St., Suite 700, Boston, Massachusetts 02110.

## BACKGROUND

**A.    Defendants Collected, Maintained, and Stored PII.**

*Carrington*

22.    In providing its loan and financial services, Carrington collects sensitive personal information from customers.  This information includes name, email address, username, password, social security number, phone number, mailing address, financial information and history, employment information drivers' license information, insurance information, marital status, and other personal and highly sensitive personal information a person might

provide when trying to procure a loan or mortgage.  Carrington hosts a large repository of sensitive personal information for its customers.  Carrington also contracts with Alvaria for certain call center related services, by which Carrington authorizes Alvaria to receive and store Carrington's customers' data.

***Alvaria***

23.     Alvaria claims to be the "world leader in enterprise-scale customer experience and workforce engagement management."  It states that it is a "technology innovator[] in call center software, cloud contact center solutions, workforce optimization and customer service experience."[3]

24.     According to Alvaria, it serves 4 of 5 top commercial banks, 8 of 10 top telecom providers, 6 of 6 top airline carriers, 4 of 5 top healthcare providers, and 4 of 5 top general merchandisers.[4]

25.     In providing its services, Alvaria collects information from its clients, including Carrington, that may include sensitive personal information like name, mailing address, social security numbers, loan information, and other related information that customers provided directly to Carrington.

---

[3] https://www.linkedin.com/company/alvaria-inc. (last visited Aug. 14, 2023)
[4] https://www.alvaria.com/company/about-alvaria. (last visited Aug. 14, 2023)

**B.**     **Defendants Knew They Needed to Protect Customers' Sensitive Personal Information and Committed to Protecting that Information.**

*Carrington*

26.     Carrington has a Privacy Policy on its website that states that it respects "the privacy of each user."[5]

27.     As a condition of receiving loan servicing and other mortgaging services, Carrington requires that its customers turn over highly sensitive personal information. In its "Privacy Policy", Carrington makes clear that it "do[es] not rent, sell, or share with third parties the Personal Information [it] collect[s]" from its customers except for in the case of "[t]hird party vendors" engaged to provide services on Carrington's behalf, "such as hosting, web-site development, and support."[6] Importantly, Carrington acknowledges in the Privacy Policy that its vendors, including Alvaria, "have agreed not to disclose the Personal Information or to use it for any purpose other than providing the requested services."[7]

28.     Carrington also makes other representations related to customer privacy including:

---

[5] https://www.carringtonmortgage.com/legal/privacy-policy. (last visited Aug. 14, 2023)

[6] *Id.*

[7] *Id.*

(1)   "Ensuring the privacy of [customer] confidential information is one of Carrington Mortgage Services, LLC's top priorities"; and

(2)   "We comply with all applicable federal, state, and local laws, and we have numerous internal safeguards in place to protect your personal information.  Carrington Mortgage Services, LLC's Privacy Officer oversees all aspects of our privacy policy throughout the company.   We treat confidential customer information with the utmost discretion and caution, and we hold our business partners [presumably like Alvaria] to these same high standards."[8]

29.    Carrington knew it needed to protect the privacy of Plaintiffs and the Class and further committed to holding its partners, like Alvaria, to the very same privacy protection standards it follows.

***Alvaria***

30.    Alvaria's Privacy Policy commits to "keeping [customers] personal information confidential and secure."  The Policy further explains that Alvaria maintains "appropriate physical, electronic, procedural, technical and organizational measures to help safeguard person information from loss, theft, misuse, unauthorized access, disclosure, alteration and destruction."[9]

31.    Alvaria knew the information from Carrington customers was highly sensitive and that it was required by law to maintain the privacy and

---

[8] https://www.carringtonmortgage.com/legal/best-practices#protectingPrivacy. (last visited Aug. 14, 2023)

[9] https://www.alvaria.com/legal/privacy-policy. (last visited Aug. 14, 2023)

confidentiality of that information.

### C. Defendants' Inadequate Data Security Measures Exposed Customers' Sensitive Personal Information.

32.    On March 9, 2023, a malicious actor gained unauthorized access to Alvaria's data systems, which included customer databases.  By doing so, the actor gained access to the sensitive personal, financial, and other information of Carrington's clients' current and former customers.

33.    Upon information and belief, the actors viewed, copied, and exfiltrated substantial amounts of Plaintiffs' and the Class's PII.  This included highly sensitive personal information such as names, mailing addresses, loan information, and partial Social Security Numbers.

34.    This is not Alvaria's first data breach.  In November of 2022, Alvaria's data system was breached, but that instance was purportedly limited to disclosure of certain corporate clients' information.  Upon information and belief, Carrington was aware of the November 2022 breach of Alvaria's data systems.

35.    Neither Alvaria nor Carrington immediately disclosed this new March 2023 Data Breach to the victims impacted by the unauthorized disclosure.  Rather, Alvaria waited until April 26, 2023, to publicly post notice of the breach, approximately seven weeks after it learned of the Data Breach.

Additionally, neither of the Defendants have disclosed the scope of the breach or the total number of impacted consumers.

36.     The April 26, 2023, notice that Alvaria provided to Plaintiffs and the Class members suggested they take time-consuming steps to help protect their information, including enrolling in identity monitoring services, obtaining a free credit report, setting up fraud alerts, and issuing a security freeze.

37.     Given that Defendants purposefully obtained and stored the PII of Plaintiffs and the Class and knew or should have known of the serious risk and harm caused by a data breach, Defendants were obligated to implement reasonable measures to prevent and detect cyberattacks. This includes measures recommended by the Federal Trade Commission and promoted by data security experts and other agencies. This obligation stems from the foreseeable risk of a data breach given that Defendants collected, stored, and had access to a swath of highly sensitive consumer records and data and, additionally, because other highly publicized data breaches at different institutions put Defendants on notice that the highly personal data they stored, or allowed other entities to store via a services contract or relationship, might be targeted by cybercriminals.

38.     Despite the highly sensitive nature of the sensitive personal information Defendants obtained, created, and stored, and the prevalence of

data breaches at financial institutions like Carrington or related businesses, Defendants inexplicably failed to implement and maintain reasonable and adequate security procedures and practices to safeguard the PII of Plaintiffs and the Class. The Data Breach itself and information Defendants have disclosed about the breach to date, including its length, the need to remediate Defendants' cybersecurity, and the sensitive nature of the impacted data, collectively demonstrate Defendants failed to implement reasonable measures to prevent the Data Breach and the exposure of highly sensitive customer information.

**D.    Exposure of PII and other Sensitive Personal Information Created a Substantial Risk of Harm.**

39.    The personal and financial information of Plaintiffs and the Class is valuable and has become a highly desirable commodity to data thieves.

40.    Defendants' failure to reasonably safeguard Plaintiffs' and the Class's sensitive PII has created a serious risk to Plaintiffs and the Class, including both a short-term and long-term risk of identity theft and other fraud.

41.    Identity theft occurs when someone uses another's personal and financial information such as that person's name, account number, Social Security number, driver's license number, date of birth, and/or other information, without permission, to commit fraud or other crimes.

42.     According to experts, one out of four data breach notification recipients becomes a victim of identity fraud.[10]

43.     Stolen PII is often trafficked on the "dark web," a heavily encrypted part of the Internet that is not accessible via traditional search engines and is frequented by criminals, fraudsters, and other wrongdoers. Law enforcement has difficulty policing the "dark web," which allows users and criminals to conceal identities and online activity.

44.     Purchasers of PII use it to gain access to the victim's bank accounts, social media, credit cards, and tax details. This can result in the discovery and release of additional PII from the victim, as well as PII from family, friends, and colleagues of the original victim. Victims of identity theft can also suffer emotional distress, blackmail, or other forms of harassment in person or online. Losses encompass financial data and tangible money, along with unreported emotional harms.

45.     The FBI's Internet Crime Complaint (IC3) 2019 report estimated there was more than $3.5 billion in losses to individual and business victims due to identity fraud in that year alone. The same report identified "rapid reporting" as a tool to help stop fraudulent transactions and mitigate losses.

---

[10] *Study Shows One in Four Who Receive Data Breach Letter Become Fraud Victims,* ThreatPost.com (last visited Aug. 14, 2023)

46.    Defendant did not rapidly report to Plaintiffs and the Class that their PII had been exposed or stolen, but instead took seven weeks to make a public notice related to the Data Breach, and even that notice did not include the number of impacted victims.

47.    The Federal Trade Commission ("FTC") has recognized that consumer data is a lucrative (and valuable) form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour reiterated that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency."[11]

48.    The FTC has also issued, and regularly updates, guidelines for businesses to implement reasonable data security practices and incorporate security into all areas of the business. According to the FTC, reasonable data security protocols require:

    (1)    encrypting information stored on computer networks;
    (2)    retaining payment card information only as long as necessary;
    (3)    properly disposing of personal information that is no longer needed or can be disposed of pursuant to relevant state and federal laws;
    (4)    limiting administrative access to business systems;

---

[11] Statement of FTC Commissioner Pamela Jones Harbour—Remarks Before FTC Exploring Privacy Roundtable, (Dec. 7, 2009) https://www.ftc.gov/news-events/news/speeches/remarks-ftc-exploring-privacy-roundtable. (last visited Aug. 14, 2023)

(5)     using industry tested and accepted methods;
(6)     monitoring activity on networks to uncover unapproved activity;
(7)     verifying that privacy and security features function properly;
(8)     testing for common vulnerabilities; and
(9)     updating and patching third-party software.[12]

49.     The United States Cybersecurity & Infrastructure Security Agency, and other federal agencies, recommend similar and supplemental measures to prevent and detect cyberattacks, including, but not limited to: implementing an awareness and training program, enabling strong spam filters, scanning incoming and outgoing emails, configuring firewalls, automating anti-virus and anti-malware programs, managing privileged accounts, configuring access controls, disabling remote desktop protocol, and updating and patching computers.

50.     The FTC cautions businesses that failure to protect PII and the resulting data breaches can destroy consumers' finances, credit history, and reputations, and can take time, money, and patience to resolve the fallout.[13] Indeed, the FTC treats the failure to implement reasonable and adequate data security measures—like Defendants failed to do here—as an unfair act or

---

[12] *Start With Security, A Guide for Business,* FTC, https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.  (last visited Aug. 14, 2023)
[13] Taking Charge, What to Do if Your Identity is Stolen, FTC, https://www.consumer.ftc.gov/sites/default/files/articles/pdf/pdf-0014-identity-theft.pdf. (last visited Aug. 14, 2023)

practice prohibited by Section 5(a) of the FTC Act.

**E.     Plaintiffs' and the Class's PII are Valuable.**

51.     Birth dates, Social Security numbers, addresses, employment information, income, and similar types of information can be used to open several credit accounts on an ongoing basis rather than exploiting just one account until it's canceled.[14]

52.     For that reason, cybercriminals on the dark web are able to sell data like Social Security numbers for large profits.

53.     Consumers place a considerable value on their PII and the privacy of that information. One 2002 study determined that U.S. consumers highly value a website's protection against improper access to their PII, between $11.33 and $16.58 per website. The study further concluded that to U.S. consumers, the collective "protection against error, improper access, and secondary use of personal information is worth between $30.49 and $44.62.[15]

---

[14] *Anthem hack: Personal data stolen sells for 10x Price of Stolen Credit Card Numbers,* Tim Greene, https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited Aug. 14, 2023)

[15] 11-Horn Hann, Kai-Lung Hui, et al, *The Value of Online Information Privacy: Evidence from the USA and Singapore*, at 17. Marshall Sch. Bus., Univ. So. Cal. (Oct. 2002), https://www.comp.nus.edu.sg/~ipng/research/privacy.pdf (last visitedAug. 14, 2023).

This data is approximately twenty years old, and the dollar amounts would likely be exponentially higher today.

54.     Defendants' Data Breach exposed a variety of Plaintiffs' and the Class members' data, including their Social Security numbers and other sensitive personal information.

55.     The Social Security Administration ("SSA") warns that a stolen Social Security number can lead to identity theft and fraud: "Identity thieves can use your number and your credit to apply for more credit in your name."[16] If the identity thief applies for credit and does not pay the bill, it will damage victims' credit and cause a series of other related problems.

56.     Social Security numbers are not easily replaced. In fact, to obtain a new number, a person must prove that he or she continues to be disadvantaged by the misuse—meaning an individual must prove actual damage has been done and will continue in the future.

57.     Plaintiffs and the Class now face years of monitoring their financial and personal records with a high degree of scrutiny.  The Class has incurred and will incur this damage in addition to any fraudulent use of their sensitive

---

[16] Social Security Administration, Identity Theft and Your Social Security Number, https://www.ssa.gov/pubs/EN-05-10064.pdf. (last visited Aug. 14, 2023)

personal information.

## CLASS ALLEGATIONS

58.   Plaintiffs bring this action on behalf of themselves and all other similarly situated Class members pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure and seek certification of the following Nationwide Class:

> All individuals whose data was impacted or otherwise compromised by the Data Breach.

59.   In addition, Plaintiffs Tennerson Collins and Otilia Collins bring this action on behalf of themselves and all other similarly situated Class members pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure and seek certification of the following California Sub-Class:

> All California residents whose PII was subjected to or otherwise compromised by the Data Breach.

60.   Excluded from the class are Defendants and their subsidiaries and affiliates; all persons who make a timely election to be excluded from the class; government entities; and the judge to whom this case is assigned and his/her immediate family and court staff.

61.   Plaintiffs reserve the right to, after conducting discovery, modify, expand, or amend the above Class definition or to seek certification of a class or Classes defined differently than above before any court determines whether

certification is appropriate.

62.     **Numerosity.** Consistent with Rule 23(a)(1), the members of the Class are so numerous and geographically dispersed that joinder of all Class members is impracticable. Plaintiffs believe that there are thousands of members of the Class, if not more. The number of impacted individuals remains unknown and unreported, and Plaintiffs believe additional entities and persons may have been affected by the Data Breach. The precise number of class members, however, is unknown to Plaintiffs. Class members may be identified through objective means. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

63.     **Commonality and Predominance**. Consistent with Fed. R. Civ. P. 23(a)(2) and with 23(b)(3)'s commonality and predominance requirements, this action involves common questions of law and fact which predominate over any questions affecting individual Class members.  These common questions include, without limitation:

a.     Whether Defendants knew or should have known that their data environment and cybersecurity measures, or those created by corporate service providers, created a risk of a data breach;

b.    Whether Defendants controlled and took responsibility for protecting Plaintiffs' and the Class's data when they solicited that data, collected it, stored it on its servers, and authorized a third party to collect and store that data;

c.    Whether Defendants' security measures were reasonable considering the FTC data security recommendations, state laws and guidelines, industry standards, and common recommendations made by data security experts;

d.    Whether Defendants owed Plaintiffs and the Class a duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the PII it collected, stored, and maintained from Plaintiffs and Class members;

e.    Whether Defendants' failure to adequately secure Plaintiffs' and the Class' data constitutes a breach of its duty to institute reasonable security measures;

f.    Whether Defendants' failure to implement reasonable data security measures allowed the breach of their data systems to occur and caused the theft of Plaintiffs' and the Class' data;

g.    Whether reasonable security measures known and recommended by the data security community could have prevented the breach;

h.     Whether Plaintiffs and the Class were injured and suffered damages or other losses because of Defendants' failure to reasonably protect its data systems; and

i.     Whether Plaintiffs and the Class are entitled to damages and/or equitable relief.

64.    **Typicality**.  Consistent with Fed. R. Civ. P. 23(a)(3), Plaintiffs are typical members of the Class.  Plaintiffs and the Class are each a person who provided data to Carrington, whose data resided on Carrington's and Alvaria's servers, and whose personally identifying information was exposed in Defendants' Data Breach.  Plaintiffs' injuries are similar to other class members and Plaintiffs seek relief consistent with the relief due to the Class.

65.    **Adequacy**.  Consistent with Fed. R. Civ. P. 23(a)(4), Plaintiffs are adequate representatives of the Class because Plaintiffs are members of the Class and are committed to pursuing this matter against Defendants to obtain relief for themselves and for the Class.  Plaintiffs have no conflicts of interest with the Class.   Plaintiffs have also retained counsel competent and experienced in complex class action litigation of this type, having previously litigated data breach cases.  Plaintiffs intend to vigorously prosecute this case and will fairly and adequately protect the Class's interests.

66.    **Superiority**.  Consistent with Fed. R. Civ. P 23(b)(3), class action

litigation is superior to any other available means for the fair and efficient adjudication of this controversy.  Individual litigation by each Class member would strain the court system because of the numerous members of the Class. Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court. A class action would also permit customers to recover even if their damages are small as compared to the burden and expense of litigation, a quintessential purpose of the class action mechanism.

67.    **Injunctive and Declaratory Relief**.  Consistent with Fed. R. Civ. P. 23(b)(2), Defendants, through their conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive and declaratory relief appropriate to the class as a whole.

## LEGAL CLAIMS

### <u>COUNT I</u>
### Negligence

68.    Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

69.    Defendants owed a duty to Plaintiffs and the members of the Class to take reasonable care in managing and protecting the sensitive data it solicited from Plaintiffs and the Class.  This duty arises from multiple sources.

70.    Defendants owed a common law duty to Plaintiffs and the Class to implement reasonable data security measures because it was foreseeable that hackers would target Defendants' data systems and servers containing Plaintiffs' and the Class's sensitive data and that, should a breach occur, Plaintiffs and the Class would be harmed.   Defendants controlled their technology, infrastructure, and cybersecurity, and to the extent Carrington outsourced its data security to Alvaria, Carrington made the decision to outsource that service.

71.    Defendants further knew or should have known that if hackers breached their data systems, they would extract sensitive data and inflict injury upon Plaintiffs and the Class.  Furthermore, Defendants knew or should have known that if hackers accessed the sensitive data, the responsibility for remediating and mitigating the consequences of the breach would largely fall on individual persons whose data was impacted and stolen.  Therefore, the Data Breach, and the harm it caused Plaintiffs and the Class, was the foreseeable consequence of Defendants' unsecured, unreasonable data security measures.

72.    Additionally, Section 5 of the Federal Trade Commission Act

("FTCA"), 15 U.S.C. § 45, required Defendants to take reasonable measures to protect Plaintiffs' and the Class's sensitive data and is a further source of Defendants' duty to Plaintiffs and the Class.  Section 5 prohibits unfair practices in or affecting commerce, including, as interpreted and enforced by the FTC, the unfair act or practice by businesses like Defendants failing to use reasonable measures to protect sensitive data.  Defendants, therefore, were required and obligated to take reasonable measures to protect data they possessed, held, or otherwise used.   The FTC publications and data security breach orders described herein further form the basis of Defendants' duty to adequately protect sensitive personal information.  By failing to implement reasonable data security measures, Defendants acted in violation of § 5 of the FTCA.

73.    Also, as alleged in further detail below, the California Consumer Privacy Act ("CCPA"), Cal. Civ. Code § 1798.100, imposes an affirmative duty on businesses, such as Defendants, which maintain personal information about California residents, to implement and maintain reasonable security procedures and practices that are appropriate to the nature of the information collected. Defendants failed to implement such procedures which resulted in the Data Breach impacting Plaintiffs' and the Class members' sensitive personal information, including PII.

74.    Defendants are obligated to perform their business operations in

accordance with industry standards. Industry standards are another source of duty and obligations requiring Defendants to exercise reasonable care with respect to Plaintiffs and the Class by implementing reasonable data security measures that do not create a foreseeable risk of harm to Plaintiffs and the Class.

75.     Finally, Defendants assumed the duty to protect sensitive data by soliciting, collecting, and storing users' data and, additionally, by representing to consumers that it lawfully complied with data security requirements and had adequate data security measures in place to protect the confidentiality of Plaintiffs' and the Class's private and sensitive personal information.

76.     Defendants breached their duty to Plaintiffs and the Class by implementing unreasonable data security measures that they knew or should have known could cause a Data Breach. Defendants knew or should have known that hackers might target sensitive data that Carrington solicited and collected, which was later collected and stored by Alvaria, on customers and, therefore, needed to use reasonable data security measures to protect against a Data Breach. Indeed, Defendants acknowledged they were subject to certain standards to protect data and utilize other industry standard data security measures.

77.     Defendants were fully capable of preventing the Data Breach.

Alvaria, as a technology utilizing company, and Carrington, a massive and savvy financial entity, knew or should have known of data security measures required or recommended by the FTC, state laws and guidelines, and other data security experts which, if implemented, would have prevented the Data Breach from occurring at all, or limited and shortened the scope of the Data Breach. Defendants thus failed to take reasonable measures to secure its system, leaving it vulnerable to a breach.

78.    As a direct and proximate result of Defendants' negligence, Plaintiffs and the Class have suffered and will continue to suffer injury, including the ongoing risk that their data will be used nefariously against them or for fraudulent purposes.

79.    Plaintiffs and the Class members have suffered damages as a result of Defendants' negligence, including actual and concrete injuries and will suffer additional injuries in the future, including economic and non-economic damages from invasion of privacy, costs related to mitigating the imminent risks of identity theft, time and effort related to mitigating present and future harms, actual identity theft, the loss of the benefit of bargained-for security practices that were not provided as represented, and the diminution of value in their PII.

## COUNT II
## Negligence Per Se

80.     Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

81.     Defendants' unreasonable data security measures constitute unfair or deceptive acts or practices in or affecting commerce in violation Section 5 of the FTC Act.   Although the FTC Act does not create a private right of action, it requires businesses to institute reasonable data security measures and breach notification procedures, which Defendants failed to do.

82.     Section 5 of the FTCA, 15 U.S.C. § 45, prohibits "unfair. . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by businesses like Defendants of failing to use reasonable measures to protect users' sensitive data.   The FTC's complaint against Defendants also forms the basis of Defendants' duty.

83.     Defendants violated Section 5 of the FTC Act by failing to use reasonable measures to protect users' personally identifying information and sensitive data and by not complying with applicable industry standards. Defendants' conduct was particularly unreasonable given the sensitive nature and amount of data Defendants stored on their users and the foreseeable consequences of a Data Breach should Defendants fail to secure their systems.

84.     Defendants' violation of Section 5 of the FTC Act constitutes negligence per se.

85.     In addition, the California Consumer Privacy Act ("CCPA"), Cal. Civ. Code §§ 1798.100, et seq. requires "[a] business that discloses personal information about a California resident pursuant to a contract with a nonaffiliated third party . . . [to] require by contract that the third party implement and maintain reasonable security procedures and practices appropriate to the nature of the information, to protect the personal information from unauthorized access, destruction, use, modification, or disclosure." 1798.81.5(c).

86.     Defendants violated the CCPA by failing to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect Plaintiffs' and Class members' PII. Defendants failed to implement reasonable security procedures and practices to prevent an attack on its servers or systems by hackers and to prevent unauthorized access and exfiltration of Plaintiffs' and Class members' PII as a result of the Data Breach.

87.     Plaintiffs and the Class are within the class of persons Section 5 of the FTC Act, the CCPA, and other similar state statutes, was intended to protect. Additionally, the harm that has occurred is the type of harm the FTC Act. The CCPA, and other similar state statutes, was intended to guard against.  The FTC

has pursued over fifty enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same type of harm suffered by Plaintiffs and the Class.

88.     As a direct and proximate result of Defendants' negligence per se, Plaintiffs and the Class have suffered and continue to suffer injury.

## COUNT III
## Breach of Contract

89.     Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

90.     Plaintiffs and Class Members entered into a valid and enforceable contract through which they were required to turn over their sensitive personal information to Carrington in exchange for services.

91.     That contract included promises by Carrington to secure, safeguard, and not disclose Plaintiffs' and Class Members' sensitive personal information to any third parties without their consent.

92.     Carrington's Privacy Policy memorialized the rights and obligations of Carrington and its customers. This document was provided to Plaintiffs and Class Members in a manner in which it became part of the agreement for services.

93.     In its Privacy Policy, Carrington commits to protecting the privacy and security of the sensitive personal information and promises to never share Plaintiffs' and Class Members' PII except under certain limited circumstances.

94.     Plaintiffs and Class Members fully performed their obligations under their contracts with Carrington. However, Carrington failed to secure, safeguard, and/or keep private Plaintiffs' and Class Members' PII, and therefore Carrington breached its contracts with Plaintiffs and Class Members.

95.     Despite its knowledge of Alvaria's previous lax data security measures that resulted in at least one previously known data breach in November of 2022, Carrington allowed Alvaria to maintain possession and control of Plaintiffs' and Class Members' PII, which predictably led to criminal third parties accessing, copying, and or exfiltrating Plaintiffs' and Class Members' PII without permission through Carrington's failure to adequately vet and supervise Defendant Alvaria. Therefore, Carrington breached its contracts with Plaintiffs and Class Members.

96.     Carrington's failure to satisfy its confidentiality and privacy obligations, specifically those arising under the FTC Act, resulted in Carrington providing services to Plaintiffs and Class Members that were of a diminished value and in breach of its contractual obligations to Plaintiffs and Class Members.

97.     As a result, Plaintiffs and Class Members have been harmed, damaged, and/or injured as described herein, including by Carrington's failure to fully perform its part of the agreement with Plaintiffs and Class Members.

98.     As a direct and proximate result of Carrington's conduct, Plaintiffs and Class Members suffered and will continue to suffer damages in an amount to be proven at trial.

99.     In addition to monetary relief, Plaintiffs and Class Members are also entitled to injunctive relief requiring Carrington to, inter alia, strengthen its data security monitoring and supervision procedures, conduct periodic audits of those procedures, and provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members.

## COUNT IV
### Breach of Implied Contract

100.    Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

101.    This Count is pleaded in the alternative to Count III above.

102.    Carrington provides mortgage services to Plaintiffs and Class Members. Plaintiffs and Class Members formed an implied contract with Carrington regarding the provision of those services through its collective conduct, including by Plaintiffs and Class Members providing their PII to

Carrington in exchange for the services offered.

103.   Through Carrington's offering of these services, it knew or should have known that it needed to protect Plaintiffs' and Class Members' confidential PII in accordance with its own policies, practices, and applicable state and federal law.

104.   As consideration, Plaintiffs and Class Members turned over valuable PII bargained with Carrington to securely maintain and store their PII.

105.   Carrington accepted possession of Plaintiffs' and Class Members' PII for the purpose of providing services, including data security, to Plaintiffs and Class Members.

106.   In delivering their PII to Carrington in exchange for its services, Plaintiffs and Class Members intended and understood that Carrington would adequately safeguard their PII as part of those services.

107.   Carrington's implied promises to Plaintiffs and Class Members include, but are not limited to, (1) taking steps to ensure that anyone who is granted access to PII, including its business associates, vendors, and/or suppliers, also protect the confidentiality of that data; (2) taking steps to ensure that the PII that is placed in the control of its business associates, vendors, and/or suppliers is restricted and limited to achieve an authorized business purpose; (3) restricting access to qualified and trained employees, business

associates, vendors, and/or suppliers; (4) designing and implementing appropriate retention policies to protect the PII against criminal data breaches; (5) applying or requiring proper encryption; (6) implementing multifactor authentication for access; and (7) taking other steps to protect against foreseeable data breaches.

108.    Plaintiffs and Class Members would not have entrusted their PII to Carrington in the absence of such an implied contract.

109.    Had Carrington disclosed to Plaintiffs and the Class that it did not have adequate data security and data supervisory practices to ensure the security of their sensitive data, including but not limited to Carrington's decision to continue to entrust Plaintiffs' and Class Members' PII to Alvaria despite Alvaria's November 2022 data breach, Plaintiffs and Class Members would not have agreed to provide their PII to Carrington or agreed to allow Carrington to provide their PII to Alvaria.

110.    As providers of lending and mortgage servicing operations, Carrington recognized (or should have recognized) that Plaintiffs' and Class Member's PII is highly sensitive and must be protected, and that this protection was of material importance as part of the bargain with Plaintiffs and the Class.

111.    Carrington violated these implied contracts by failing to employ reasonable and adequate security measures and supervision of its vendors,

business associates, and/or suppliers to secure Plaintiffs' and Class Members' PII.

112.    A meeting of the minds occurred, as Plaintiffs and Class Members agreed, *inter alia*, to provide their accurate and complete sensitive personal information to Carrington in exchange for Carrington's agreement to, *inter alia*, protect their PII.

113.    Plaintiffs and Class Members have been damaged by Defendants' conduct, including the harms and injuries arising from the Data Breach now and in the future, as alleged herein.

## COUNT V
## Breach of Third-Party Beneficiary Contract
## (Against Alvaria)

114.    Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

115.    Alvaria is a workforce management and call center technology solution company.

116.    Alvaria entered into a contract with Carrington in which it promised not to ever disclose Plaintiffs' and Class Members' PII or to use it for any purpose other than the services requested by Carrington.

117.    This contract was made expressly for the benefit of Plaintiffs and the Class, as it was their PII that Alvaria agreed to collect and promised Carrington it would protect.

118.    Alvaria knew that if it were to breach this contract with Carrington, then Carrington's customers, including Plaintiffs and Class Members, would be harmed.

119.    Alvaria breached its contract with Carrington when it failed to use reasonable data security measures, including those in compliance with the FTC Act and industry standards, that could have prevented the Data Breach.

120.    As foreseen, Plaintiffs and the Class were harmed by Alvaria's

breach, as set forth herein.

121.    Accordingly, Plaintiffs and Class Members are entitled to damages in an amount to be determined at trial, along with their costs and attorney's fees incurred in this action.

## COUNT VI
### Breach of Fiduciary Duty

122.    Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

123.    A relationship existed between Plaintiffs and Class Members and Defendants in which Plaintiffs and Class Members put their trust in Defendants to protect the PII of Plaintiffs and Class Members and Defendants accepted that trust.

124.    Defendants breached the fiduciary duties that they owed to Plaintiffs and Class Members by failing to act with the utmost good faith, fairness, and honesty, failing to act with the highest and finest loyalty, and failing to protect the PII of Plaintiffs and Class Members.

125.    Defendants' breach of fiduciary duty was a legal cause of damage to Plaintiffs and Class Members.

126.    But for Defendants' breach of fiduciary duty, the damage to Plaintiffs and Class Members would not have occurred.

127.    Defendants' breach of fiduciary duty contributed substantially to producing the damage to Plaintiffs and Class Members.

128.    As a direct and proximate result of Defendants' breach of fiduciary duty, Plaintiffs are entitled to and demand actual, consequential, and nominal damages and injunctive relief.

## COUNT VII
## Unjust Enrichment/Quasi Contract

129.    Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

130.    Plaintiffs and Class Members conferred a benefit on Defendants. Specifically, they provided Defendants with their PII, which PII has inherent value. In exchange, Plaintiffs and Class Members should have been entitled to Defendants' adequate protection and supervision of their PII, especially in light of their special relationship.

131.    Defendants knew that Plaintiffs and Class Members conferred a benefit upon them and have accepted and retained that benefit by accepting and retaining the PII entrusted to them. Defendants profited from Plaintiffs' retained data and used Plaintiffs' and Class Members' PII for business purposes.

132.    Defendants failed to secure Plaintiffs' and Class Members' PII and,

therefore, did not fully compensate Plaintiffs or Class Members for the value that their PII provided.

133.    Defendants acquired the PII through inequitable record retention as it failed to disclose the inadequate data security practices, procedures, and protocols previously alleged.

134.    If Plaintiffs and Class Members had known that Defendants would not use adequate data security practices, procedures, and protocols to secure their PII, they would have made alternative mortgage servicing choices that excluded Defendants.

135.    Under the circumstances, it would be unjust for Defendants to be permitted to retain any of the benefits that Plaintiffs and Class Members conferred upon them.

136.    As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have suffered and/or will suffer injury, including but not limited to: (i) the imminent and substantial risk of actual identity theft; (ii) the loss of the opportunity to control how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate

the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their PII, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect PII in their continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

137.   Plaintiffs and Class Members are entitled to full refunds, restitution, and/or damages from Defendants and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct alleged herein. This can be accomplished by establishing a constructive trust from which the Plaintiffs and Class Members may seek restitution or compensation.

138.   Plaintiffs and Class Members may not have an adequate remedy at law against Defendants, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

## COUNT VIII
## Declaratory and Injunctive Relief

139.     Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

140.     Under the Declaratory Judgment Act, 28 U.S.C. §§2201, et seq., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief.  Furthermore, the Court has broad authority to restrain acts, such as those alleged herein, which are tortious, and which violate the terms of the federal and state statutes described above.

141.     An actual controversy has arisen in the wake of the Data Breach at issue regarding Defendants' common law and other duties to act reasonably with respect to safeguarding the data of Plaintiffs and the Class.  Plaintiffs allege Defendants' actions in this respect were inadequate and unreasonable and, upon information and belief, remain inadequate and unreasonable. Additionally, Plaintiffs and the Class continue to suffer injury due to the continued and ongoing threat of additional fraud against them or on their accounts.

142.     Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a.      Defendants owed, and continue to owe a legal duty to secure the sensitive personal information with which they are entrusted, specifically including information obtained from its customers, and to notify impacted individuals of the Data Breach under the common law, Section 5 of the FTC Act;

b.      Defendants breached, and continue to breach, their legal duty by failing to employ reasonable measures to secure their customers' personal information; and,

c.      Defendants' breach of their legal duty continues to cause harm to Plaintiffs and the Class.

143.   The Court should also issue corresponding injunctive relief requiring Defendants to employ adequate security protocols consistent with industry standards to protect its users' data.

144.   If an injunction is not issued, Plaintiffs and the Class will suffer irreparable injury and lack an adequate legal remedy in the event of another breach of Defendants' data systems.  If another breach of Defendants' data systems occurs, Plaintiffs and the Class will not have an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the same conduct.  Simply put, monetary damages, while warranted to compensate Plaintiffs and the Class

for their out-of-pocket and other damages that are legally quantifiable and provable, do not cover the full extent of injuries suffered by Plaintiffs and the Class, which include monetary damages that are not legally quantifiable or provable.

145.   The hardship to Plaintiffs and the Class if an injunction does not issue exceeds the hardship to Defendants if an injunction is issued.

146.   Issuance of the requested injunction will not disserve the public interest.   To the contrary, such an injunction would benefit the public by preventing another data breach, thus eliminating the injuries that would result to Plaintiffs, the Class, and the public at large.

### COUNT IX
### Violation of the California Consumer Privacy Act of 2018 ("CCPA")
### Cal. Civ. Code §§ 1798.100, et seq.

147.   Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

148.   As more personal information about consumers is collected by businesses, consumers' ability to properly protect and safeguard their privacy has decreased. Consumers entrust businesses with their personal information on the understanding that businesses will adequately protect it from unauthorized access. The California Legislature explained: "The unauthorized

disclosure of personal information and the loss of privacy can have devasting effects for individuals, ranging from financial fraud, identity theft, and unnecessary costs to personal time and finances, to destruction of property, harassment, reputational damage, emotional stress, and even potential physical harm."[17]

149.    As a result, in 2018, the California Legislature passed the CCPA, giving consumers broad protections and rights intended to safeguard their personal information. Among other things, the CCPA imposes an affirmative duty on businesses that maintain personal information about California residents to implement and maintain reasonable security procedures and practices that are appropriate to the nature of the information collected. Defendants failed to implement such procedures which resulted in the Data Breach.

150.    It also requires "[a] business that discloses personal information about a California resident pursuant to a contract with a nonaffiliated third party . . . [to] require by contract that the third party implement and maintain reasonable security procedures and practices appropriate to the nature of the

---

[17]    California Consumer Privacy Act (CCPA) Compliance, https://buyergenomics.com/ccpa-complience/. (last visited Aug. 14, 2023).

information, to protect the personal information from unauthorized access, destruction, use, modification, or disclosure." 1798.81.5(c).

151.     Section 1798.150(a)(1) of the CCPA provides: "Any consumer whose nonencrypted or nonredacted personal information, as defined [by the CCPA] is subject to an unauthorized access and exfiltration, theft, or disclosure as a result of the business' violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information may institute a civil action for" statutory or actual damages, injunctive or declaratory relief, and any other relief the court deems proper.

152.     Plaintiffs Tennerson and Otilia Collins, and other similarly situated California Sub-Class members, are "consumer[s]" as defined by Civ. Code § 1798.140(g) because they are "natural person[s] who [are] California resident[s], as defined in Section 17014 of Title 18 of the California Code of Regulations, as that section read on September 1, 2017.

153.     Defendants are a "business" as defined by Civ. Code § 1798.140(c) because Defendants:

a.  are a "sole proprietorship, partnership, limited liability company, corporation, association, or other legal entity that is

organized or operated for the profit or financial benefit of its shareholders or other owners";

b. "collects consumers' personal information, or on the behalf of which is collected and that alone, or jointly with others, determines the purposes and means of the processing of consumers' personal information";

c. do business in and is headquartered in California; and

d. have annual gross revenues in excess of $25 million; annually buys, receives for the business' commercial purposes, sells, or shares for commercial purposes, alone or in combination, the personal information of 50,000 or more consumers, households, or devices; or derives 50 percent or more of its annual revenues from selling consumers' personal information.

154.    The PII accessed and taken by unauthorized persons in the Data Breach is "personal information" as defined by Civil Code § 1798.81.5(d)(1)(A) because it contains Plaintiffs' and other Class members' unencrypted names, mailing addresses, telephone numbers, loan account numbers, current loan balances, and the last four digits of their and Social Security numbers, among other personal information.

155.    Plaintiffs' PII was subject to unauthorized access and exfiltration, theft, or disclosure because their PII, including names, mailing addresses, telephone numbers, loan account numbers, current loan balances, and the last four digits of their and Social Security numbers, at minimum, were wrongfully accessed, viewed, and/or taken by unauthorized persons in the Data Breach.

156.    The Data Breach occurred as a result of Defendants' failure to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect Plaintiffs' and Class members' PII. Defendants failed to implement reasonable security procedures to prevent an attack on its servers or systems by hackers and to prevent unauthorized access and exfiltration of Plaintiffs' and Class members' PII as a result of the Data Breach.

157.    As a result of Defendants' failure to implement and maintain reasonable security procedures and practices that resulted in the Data Breach, Plaintiffs, individually and on behalf of the Class, seeks actual damages, equitable relief, including public injunctive relief, and declaratory relief, and any other relief as deemed appropriate by the Court.

158.    On or about May 5, 2023, Plaintiffs provided Defendants with written notice of its violations of the CCPA, pursuant to Civil Code § 1798.150(b)(1). Defendant has not responded to Plaintiffs' written notice or

cured the violation within 30 days thereof. Therefore, in addition to the above, Plaintiffs also seek statutory damages as permitted by Civil Code § 1798.150(a)(1)(A).

## COUNT X
**Violation of the California Unfair Competition Law ("UCL")**
**Cal. Bus. & Prof. Code §§ 17200, *et seq.***

159.    Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

160.    The UCL prohibits any "unlawful," "fraudulent" or "unfair" business act or practice and any false or misleading advertising, as those terms are defined by the UCL and relevant case law. By virtue of the above-described wrongful actions, inaction, omissions, and want of ordinary care that directly and proximately caused the Data Breach, Defendants engaged in unlawful, unfair, and fraudulent practices within the meaning, and in violation of, the UCL.

161.    In the course of conducting its business, Defendants committed "unlawful" business practices by, *inter alia*, knowingly failing to design, adopt, implement, control, direct, oversee, manage, monitor and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect Plaintiffs' and Class members' PII, and by violating the statutory and common law alleged herein, including, *inter alia*, California Consumer Privacy Act of 2018 (Cal. Civ. Code §§ 1798.100,

*et seq.*) and Article I, Section 1 of the California Constitution (California's constitutional right to privacy) and Civil Code § 1798.81.5. Plaintiffs and Class members reserve the right to allege other violations of law by Defendants constituting other unlawful business acts or practices. Defendants' above-described wrongful actions, inaction, omissions, and want of ordinary care are ongoing and continue to this date.

162.   Defendants also violated the UCL by failing to promptly notify Plaintiffs and Class members pursuant to California Civil Code § 1798.82(a) regarding the unauthorized access and disclosure of their PII. If Plaintiffs and Class members had been notified in an appropriate fashion, they could have taken precautions to better safeguard and protect their PII and identities.

163.   Defendants' above-described wrongful actions, inaction, omissions, want of ordinary care, misrepresentations, practices, and non-disclosures also constitute "unfair" business acts and practices in violation of the UCL in that Defendants' wrongful conduct is substantially injurious to consumers, offends legislatively-declared public policy, and is immoral, unethical, oppressive, and unscrupulous. Defendants' practices are also contrary to legislatively declared and public policies that seek to protect PII and ensure that entities who solicit or are entrusted with personal data utilize

appropriate security measures, as reflected by laws such as the CCPA, Article I, Section 1 of the California Constitution, and the FTC Act (15 U.S.C. § 45).

164.    The gravity of Defendants' wrongful conduct outweighs any alleged benefits attributable to such conduct. There were reasonably available alternatives to further Defendants' legitimate business interests other than engaging in the above-described wrongful conduct.

165.    The UCL also prohibits any "fraudulent business act or practice." Defendants' above-described claims, nondisclosures and misleading statements were false, misleading, and likely to deceive the consuming public in violation of the UCL.

166.    As a direct and proximate result of Defendants' above-described wrongful actions, inaction, omissions, and want of ordinary care that directly and proximately caused the Data Breach and its violations of the UCL, Plaintiffs and Class members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*, (i) an imminent, immediate and the continuing increased risk of identity theft and identity fraud – risks justifying expenditures for protective and remedial services for which they are entitled to compensation, (ii) invasion of privacy, (iii) breach of the confidentiality of their PII, (iv) statutory damages under the CCPA, (v) deprivation of the value of their PII for which there is a well-

established national and international market, and/or (vi) the financial and temporal cost of monitoring their credit, monitoring financial accounts, and mitigating damages.

167.   Unless restrained and enjoined, Defendants will continue to engage in the above-described wrongful conduct and more data breaches will occur. Therefore, Plaintiffs individually and on behalf of the Class members, and the general public, also seeks restitution and an injunction, including public injunctive relief prohibiting Defendants from continuing such wrongful conduct, and requiring Defendants to modify their corporate culture and design, adopt, implement, control, direct, oversee, manage, monitor and audit appropriate cybersecurity, data security practices, controls, policies, procedures protocols, and software and hardware systems to safeguard and protect the PII entrusted to it, as well as all other relief the Court deems appropriate, consistent with Cal. Bus. & Prof. Code § 17203.

<u>**Count XI**</u>
**Violation of Mass. Gen. Laws Ann. 93A, §§ 1, *et seq*.**

168.   Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

169.   This claim brought individually under the laws of Massachusetts and on behalf of all other natural persons whose PII was compromised.

170.   Defendants, Plaintiff and Class Members are "persons" as meant by Mass. Gen. Laws. Ann. Ch. 93A, § 1(a).

171.   The Defendants operate in "trade or commerce" as meant by Mass. Gen. Laws Ann. Ch. 93A, § 1(b).

172.   Defendants advertised, offered, or sold goods or services in Massachusetts and engaged in trade or commerce directly or indirectly affecting the people of Massachusetts, as defined by Mass. Gen. Laws Ann. Ch. 93A, § 1(b).

173.   Plaintiff Nulf, through Counsel, sent written demands for relief on behalf of himself and all class members pursuant to Mass. Gen. Laws Ann. Ch. 93A § 9(3)—including, but not limited to on June 6, 2023 to Carrington and in early July 2023 to Alvaria.  Carrington responded to the 93A letter on July 6, 2023 and Alvaria responded to the 93A letter on July 14, 2023.  Both Defendants denied liabilities in their responses.

174.   Based on the allegations above, *supra*, Defendants engaged in unfair methods of competition and unfair and deceptive acts and practices in the conduct of trade or commerce, in violation of Mass. Gen. Laws Ann. Ch. 93A, § 2(a), including by:

> a.   Failing to implement and maintain reasonable security and privacy measures to protect Plaintiffs' and Class Members' Private Information, which was a direct and proximate cause

of the Data Breach;

b.   Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c.   Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Class Members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45 and the Massachusetts Data Security statute and its implementing regulations, Mass. Gen. Laws Ann. Ch. 93H, § 2; 201 Mass. Code Regs. 17.01-05, which was a direct and proximate cause of the Data Breach;

d.   Misrepresenting that it would protect the privacy and confidentiality of Plaintiffs' and Class Members' PII, including by implementing and maintaining reasonable security measures;

e.   Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Class Members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45 and the Massachusetts Data Security statute and its implementing regulations, Mass. Gen. Laws Ann. Ch. 93H, § 2; 201 Mass. Code Regs. 17.01-05; f. Failing to timely and adequately notify Plaintiffs and Class Members of the Data Breach;

f.   Misrepresenting that certain sensitive PII was not accessed during the Data Breach, when it was;

g.   Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiffs' and Class Members' PII; and

h.   Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Class

> Members' PII, including duties imposed by the FTC Act, 15
> U.S.C. § 45 and the Massachusetts Data Security statute and
> its implementing regulations, Mass. Gen. Laws Ann. Ch. 93H,
> § 2; 201 Mass. Code Regs. 17.01-05.

175.   Each of the Defendant's acts and practices were "unfair" because they fall within the penumbra of common law, statutory, and established concepts of unfairness, given that each of the Defendants solely held the true facts about its inadequate security for PII, which Plaintiffs and Class Members could not independently discover.

176.   The Defendants' representations and omissions were material because they were likely to deceive reasonable consumers, including Plaintiffs and Class Members, that their PII was not exposed and misled Plaintiffs and Class Members into believing they did not need to take actions to secure their identities.

177.   Consumers could not have reasonably avoided injury because the Defendants' business acts and practices unreasonably created or took advantage of an obstacle to the free exercise of consumer decision-making. By withholding important information from consumers about the inadequacy of its data security, The Defendants created an asymmetry of information between themselves and consumers that precluded consumers from taking action to avoid or mitigate injury.

178.  The Defendants' inadequate data security had no countervailing benefit to consumers or to competition. Each of the Defendants intended to mislead Plaintiffs and Class Members and induce them to rely on its misrepresentations and omissions. The Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of the Defendants' data security and ability to protect the confidentiality of consumers' PII.

179.  Each of the Defendants acted intentionally, knowingly, and maliciously to violate Massachusetts' Consumer Protection Act, and recklessly disregarded Plaintiffs' and Class Members' rights.

180.  As a direct and proximate result of the Defendants' unfair and deceptive trade practices, Plaintiffs and Class Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; and loss of value of their PII.

181.  Plaintiffs and Class Members seek all monetary and non-monetary relief allowed by law, including actual damages, double or treble damages, injunctive or other equitable relief, and attorneys' fees and costs.

**Count XII**
**Violation of Mass. Gen. Laws Ann. 93A, §§ 11, *et seq*.**

182.   Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

183.   Based in the allegations herein, *supra*, the Plaintiffs are engaged in trade or commerce, and have suffered loss of money or property due to the use of an unfair method of competition or an unfair or deceptive business practice by Defendants.

184.   Based on the allegations herein, *supra*, the actions and transactions constituting the unfair or deceptive act or practices occurred primary and substantially within Massachusetts.   The center of gravity of Defendants' deceptive and unfair acts and practices is within the Commonwealth of Massachusetts.

185.   As a result of Defendants' deceptive and unfair acts and practices the Plaintiffs were injured.

**PRAYER FOR RELIEF**

186.   Wherefore, Plaintiffs, on behalf of themselves and the Class, request that this Court award relief as follows:

a.   An order certifying the class and designating Plaintiffs as the Class Representatives and their counsel as Class Counsel;

b.   An award to Plaintiffs and the proposed Class members of damages and equitable relief with pre-judgment and post-judgment interest;

c.   A declaratory judgment in favor of Plaintiffs and the Class;

d.   Injunctive relief to Plaintiff and the Class;

e.   An award of attorneys' fees and costs as allowed by law; and

f.   An award such other and further relief as the Court may deem necessary or appropriate.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a jury trial for all the claims so triable.

Dated: August 14, 2023                    Respectfully submitted,

*/s/ David K. Lietz*
David K. Lietz *(admitted Pro Hac Vice)*
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
5335 Wisconsin Ave., NW, Suite 440
Washington, DC 20015
Phone: 866.252.0878
dlietz@milberg.com

Gary M. Klinger*
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Telephone: (866) 252-0878

Brian D. Flick (OH 0081605)
*Admitted Pro Hac Vice*
DannLaw
15000 Madison Ave.
Lakewood, OH 44107
Phone: (513) 645-3488
Fax: (216) 373-0536

Mason A. Barney*
**SIRI & GLIMSTAD LLP**
745 Fifth Avenue, Suite 500
New York, New York 10151
Tel: (212) 532-1091

Brian C. Gudmundson*
**ZIMMERMAN REED LLP**
1100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone: (612) 341-0400
Facsimile: (612) 341-0844

*Interim Co-Lead Counsel for Plaintiffs and the putative class*

Mona Amini*
**KAZEROUNI LAW GROUP, APC**
245 Fischer Avenue, Suite D1
Costa Mesa, CA 92626
Telephone: (800) 400-6808 Ext: 2
Facsimile: 800-520-5523

*Interim Liaison Counsel for the Plaintiffs and Putative Class*

## CERTIFICATE OF SERVICE

The undersigned attorney of record hereby certifies that the foregoing document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

Dated: August 14, 2023             */s/ David K. Lietz*
                                   *David K. Lietz*